SPECIALTIES, INC., Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 15615.

United States District Court
E. D. New York.

May 19, 1959.

**90**

Jerome H. Doran, Mineola, for plaintiff.

Charles K. Rice, Asst. Atty. Gen., James P. Garland, Lyle M. Turner and Arthur L. Biggins, Attys., Dept. of Justice, Washington, D. C., Cornelius W. Wickersham, U. S. Atty., Eastern Dist. of New York, Brooklyn, N. Y., for defendant.

ABRUZZO, District Judge.

The plaintiff is a New York corporation specializing in the design, development and production of technical equipment requiring a high degree of professional research and engineering.

This action is for a refund claimed by the plaintiff to be excess profits taxes paid for the fiscal year ending July 31, 1951. After payment had been made and within the required time the plaintiff filed a claim for refund with the District Director of Internal Revenue, Brooklyn, New York (Ex. A annexed to the complaint). A small portion of the claim was allowed, the balance disallowed, and this action based upon that disallowance was commenced in June, 1955. The amount sought to be recovered is $13,020.

The agreement under which this suit was commenced is dated July 27, 1951 (Pltf's Ex. 9). This agreement at page 1 contains a list of the items to be furnished by the plaintiff to the defendant but the single item in dispute is numbered 1 and reads as follows:

| Item | Articles or Services | Total Price |
|---|---|---|
| 1 | Prepare and furnish in the form of ozalid transparencies a complete set of detail manufacturing drawing and group lists. | $44,000.00 |

The only testimony drawn during the trial was that of John C. Slocum, vice president and secretary of the plaintiff.

The plaintiff cites 26 U.S.C.A.Excess Profits Taxes, § 456(a)(1) and (2), Internal Revenue Code of 1939 as amended by the Excess Profits Tax Act of 1950, and Regulation 130, Section 40.456–2(b), supporting his contention.

The applicable portions of Section 456 read as follows:

"§ 456. *Abnormalities in income in taxable period*

"(a) *Definitions.* For the purposes of this section—

"(1) *Abnormal income.* The term 'abnormal income' means income of any class described in paragraph (2) includible in the gross income of the taxpayer for any taxable year under this subchapter if it is abnormal for the taxpayer to derive income of such class, or, if the taxpayer normally derives income of such class but the amount of such income of such class includible in the gross income of the taxable year is in excess of 115 per centum of the average amount of the gross income of the same class for the four previous taxable years, or, if the taxpayer was not in existence for four previous taxable years, the tax-

able years during which the taxpayer was in existence.

"(2) *Separate classes of income.* Each of the following subparagraphs shall be held to describe a separate class of income:

"(A) Income arising out of a claim, award, judgment, or decree, or interest on any of the foregoing; or

"(B) Income resulting from exploration, discovery, or prospecting, or any combination of the foregoing, extending over a period of more than 12 months; or

"(C) Income from the sale of patents, formulae, or processes, or any combination of the foregoing, developed over a period of more than 12 months; or

"(D) Income includible in gross income for the taxable year rather than for a different taxable year by reason of a change in the taxpayer's method of accounting.

"All the income which is classifiable in more than one of such subparagraphs shall be classified under the one which the taxpayer irrevocably elects. The classification of income of any class not described in subparagraphs (A) to (D), inclusive, shall be subject to regulations prescribed by the Secretary.

"(3) *Net abnormal income.*—The term 'net abnormal income' means the amount of the abnormal income less, under regulations prescribed by the Secretary, (A) 115 per centum of the average amount of the gross income of the same class determined under paragraph (1), and (B) an amount which bears the same ratio to the amount of any costs or deductions relating to such abnormal income, allowable in determining the normal-tax net income for the taxable year, as the excess of the amount of such abnormal income over 115 per centum of such average amount bears to the amount of such abnormal income.

"(b) *Amount attributable to other years.* The amount of the net abnormal income that is attributable to any previous or future taxable year or years, shall be determined under regulations prescribed by the Secretary. In the case of amounts otherwise attributable to future taxable years, if the taxpayer either transfers substantially all its properties or distributes any property in complete liquidation, then there shall be attributable to the first taxable year in which such transfer or distribution occurs (or if such year is previous to the taxable year in which the abnormal income is includible in gross income, to such latter taxable year) all amounts so attributable to future taxable years not included in the gross income for a previous taxable year.

Regulation 130, Sec. 40.456–2(b):

"Other income not within a class described in subparagraph (A)–(D) of Section 456(a)(2) to which Section 456 is applicable may be grouped by the taxpayer * * * in such classes similar to those specified in subparagraphs (A)–(D) of Section 456(a)(2) as are reasonable in a business of the type which taxpayer conducts and as are appropriate in the light of the taxpayer's business experience and accounting practice."

The plaintiff concedes that the sole issue involved is whether the item of $44,000, less a $600 deduction for legal expenses, accrued by the plaintiff for its fiscal year ending July 31, 1951, was abnormal income within the provisions of subdivisions (a)(2)(A) and (a)(2)(C) of Section 456 of the Internal Revenue Code and the Regulations applicable to Section 456 in its entirety, supra, and therefore, not subject to excess profits taxes.

It is conceded by the defendant that the amount of $44,000, less $600 for legal expenses, was included by the plaintiff in the computation of its excess profits taxes for the said fiscal year and the ex-

cess profits taxes of $13,020 were paid thereon.

Two main issues are raised by the plaintiff:

Point I. The $44,000 paid to plaintiff in 1951 was abnormal income arising out of plaintiff's claim for the Government's unauthorized use of plaintiff's patent.

Point II. The Government did not have, nor did it acquire, any rights or licenses to use or permit the use of the Hays patent prior to the contract of July 27, 1951.

The various exhibits in support of plaintiff's claim are as follows:

(A) Contract NOrd–7010 (Pltf. Ex. 14)

(B) The Schedule (Pltf. Ex. 18) submitted upon the termination of contract 7010

(C) The patent license of September 12, 1947 (Deft. Ex. E)

(D) Other patents developed by plaintiff while contract 7010 was being performed

(E) The events leading to the contract of July 27, 1951 (Pltf. Ex. 9)

The defendant's contention follows:

1. The Excess Profits Tax Act of 1950 does not apply to the payment of the tax made by the plaintiff.

2. The payment does not qualify as abnormal income received from a settlement of a claim.

3. The payment does not qualify as income resulting from the sale of a patent developed over a period of more than 12 months.

4. The taxpayer has failed to show it is entitled to relief from the Excess Profits Tax Act.

Contract NOrd–7010, plaintiff's Exhibit 14, was an open-end contract entered into in 1944 by the plaintiff with the Navy Department for the performance of certain specified work which included the design and development of a gun sight assembly. This contract was terminated on July 31, 1947. Prior to the termination and on July 18, 1947, a letter listing the schedule of the plaintiff's patents or patent applications (Ex. 18), as required by Article 10, Section 8, of Contract NOrd–7010, was forwarded by the plaintiff to the Bureau of Ordnance, Navy Department. In paragraph 17 on page 5 of this schedule plaintiff refers to its new a–c Servo system. This Servo system is the Hays patent and was used in the gun sights (Tr. 104 and Ex. 19).

Exhibit 18 lists various other patents and patent applications filed by plaintiff during the time Contract NOrd–7010 was being performed. Slocum testified at page 105 that there were 15 or 16 patent applications listed in the schedule, however, only eight patent applications are specifically listed by application number (1) for a simplified gun or rocket sight setting computer; (2) for a sight with recticule image; (3) for a fluid stream director; (4) for a gyroscope lead computer; (5) for a Skid indicator; (6) for a redesigned sight unit Mk 3 dive bomb sight (later abandoned); (7) for a remote control circuit; and (8) for another remote control circuit. Exhibit 18 also refers to the Hays patent by description as the new a–c Servo system and also to other patents by reference to letters previously sent by plaintiff to the Ordnance Bureau or by the Bureau to plaintiff. These patents are not otherwise described. Exhibit 19 is a copy of a letter on the letterhead of the Navy Department's Office of Naval Research returning two licenses issued by the plaintiff to the Navy, one of which is specifically referred to as the Hays license.

There was received in evidence a license agreement dated September 12, 1947 (Ex. E), issued by the plaintiff to the Government, whereby plaintiff gave the Government a non-exclusive irrevocable royalty-free license under the patent application of Hays, Serial No. 754008 (this is the application number of the patent under which the plaintiff has instituted the instant action) to manufacture sight units of the type known as Sight Unit Mk 5 and Sight Unit Mk 6. This license agreement spe-

cifically states that the plaintiff manufactured for the Government sight units embodying a Servo system described and claimed in the patent application No. 754008.

The agreement marked in evidence Pltf's Ex. 9 expired and after its expiration date the agreement marked Ex. E was entered into. That exhibit reads in part as follows:

" * * * the contractor does hereby and herewith grant and give to the government, represented for the purpose hereof by the Secretary of the Navy, a non-exclusive, irrevocable, royalty-free license under said application for patent and any continuation, renewal or division thereof and any and all patents issuing thereunder and under all reissues and extensions of said patents for the full term or terms of said patents, * * *."

In the Fall of 1950, the Emerson Radio & Phonograph Company had been awarded a Navy contract for the production of a substantial quantity of the altitude injection assemblies embodied in this so-called Hays patent. This Emerson agreement was questioned by the plaintiff and discussions were had. An impasse was reached, the Navy claiming to have proprietary rights, the plaintiff contending that it did not. Exhibit E certainly gave the Navy the right to use the Hays patent. This dispute after many conferences was resolved on December 29, 1950, and in order to expedite matters, there being an urgent need for the Hays patent to be used by the Emerson Radio & Phonograph Company under its contract with the Navy, the plaintiff agreed to sell to the Navy a royalty-free license for the Hays modulator circuit patent for the sum of $44,000. As it appeared that it would take two years to make a valid patent search and to overcome this delay because of urgent necessity, a technical assistance contract (letter dated April 27, 1951) was entered into and consummated whereby the plaintiff sold to the Navy for the price of $44,000 its drawings and details of

the patent for use by Emerson to perform its contract with the Navy, and without further cost the plaintiff granted the Navy a royalty-free license to use this patent. This was by letter dated April 27, 1951 (Pltf's Ex. 8). Exhibit 8 includes other items but for the purpose of this case we are concerned only with the items which made up the payment of $44,000.

The sole question therefore must be determined as to whether or not this $44,000 was abnormal income within the provisions of subdivisions (a)(2)(A) and (a)(2)(C) of Section 456 of the Internal Revenue Code and the Regulation applicable to Section 456 in its entirety. In addition to these two subdivisions of Section 456, the plaintiff claims that the income was received by the plaintiff within the provisions of Regulation 130, Sec. 40.456.

The plaintiff's cases cited in support of its contention are not applicable for they relate to Section 721 of the Excess Profits Tax Act of 1940 as amended in 1941 and not to the change of the Excess Profits Tax Act as it appears in the revised Section 456. Section 456 was similar to but not identical with the 1941 Excess Profits Tax Act.

Former Section 721 allowed relief for abnormal income which resulted from the sale of tangible property arising out of research and development. Section 721 became inapplicable after December 31, 1945. In enacting Section 456 Congress omitted from the Excess Profits Tax Act of 1950 any relief provision found in former Section 721 for income resulting from the sale of tangible property arising out of research and development which extended over a period of 12 months. The reports of the Senate Finance Committee and the House Committee on Ways and Means both state in parallel language that this omission was intentional (S.Rep. No. 2679, 81st Cong., 2d Sess., pp. 13–14 (1951–1 Cum.Bull. 240, 249); H.Rep. No. 3142, 81st Cong., 2d Sess., p. 13 (1951–1 Cum.Bull. 187, 195).

94

 If this sum of $44,000 was income from the sale of tangible property plaintiff is not entitled to relief. Exhibit 8 is the plaintiff's offer to the Government to sell a complete set of manufacturing drawings and group lists. Exhibit 9 refers to the articles to be furnished under the contract as a complete set of manufacturing drawings and group lists. The Hays patent rights were added as a so-called "bonus" to the sale of the drawings. Ex. 8, Tr. 60–61, 71–74. The language in these exhibits is clear and unambiguous and readily shows that the manufacturing drawings and not the patent license were the articles covered by the contract. These drawings are tangible property arising out of research and development of the altitude injection assembly and do not qualify for relief under Section 456. Even assuming arguendo that it was not the drawings that were sold but the patent rights, plaintiff would still not be entitled to relief under Section 456. $44,000 was not paid to plaintiff as the result of a claim against the Government or of an award, judgment or decree. It was not income arising from exploration, discovery or prospecting, or any combination thereof, extending over a period of more than 12 months, nor was it income from the sale of a patent, formula, or process, or any combination thereof, developed over a period of more than 12 months as provided in Section 456.

The patent was developed over a period of less than 12 months and, assuming that there was a sale of patent rights by the plaintiff, although the proof strongly suggests otherwise, the payment of $44,-000 could not be classified as abnormal income under Section 456(a)(2)(C). The testimony of Slocum, the plaintiff's vice president, is clear on this particular fact. He testified that the idea of the circuit was conceived in December, 1945. He was unable to indicate any changes which were developed or diagrammed after July 1, 1946. It, therefore, must be assumed that the assembly unit was fully developed at that time and did not involve a period exceeding seven months at the best.

The payment of $44,000 cannot be deemed to be abnormal income as defined in Section 456(a)(1). This term "abnormal income" means gross income of a taxpayer of any class described in paragraph (2) of said section if it is abnormal for the taxpayer to derive income of such class, or, if a taxpayer normally derives income of such class but in excess of 115% of the average amount of income of the same class for the four previous taxable years. This sum was income resulting from the sale of a set of manufacturing drawings and group lists. No testimony was presented on behalf of the plaintiff pertaining to its method of accounting or that said sum of $44,000 was income not within a class described by paragraphs (A) to (D) of Section 456(a)(2).

A decree in favor of the defendant, findings of fact and conclusions of law must be submitted within 15 days.